IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES M. SHOUP, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 12-1019 |
| | ) |
| CAROLYN W. COLVIN, ACTING | )   Judge Cathy Bissoon |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

# **MEMORANDUM AND ORDER**

## **I. MEMORANDUM**

For the reasons that follow, Plaintiff's Motion for Summary Judgment (Doc. 7) will be granted, and Defendant's Motion for Summary Judgment (Doc. 9) will be denied.

Plaintiff James M. Shoup, III ("Shoup"), protectively applied for supplemental security income ("SSI") benefits on October 29, 2008, alleging that he had become "disabled" on October 1, 2001. (R. at 134, 150). Pennsylvania's Bureau of Disability Determination denied the application on March 17, 2009. (R. at 81). Shoup responded on May 14, 2009, by filing a timely request for an administrative hearing. (R. at 181-182). For reasons that are not entirely clear, Shoup filed a second hearing request on June 5, 2009. (R. at 88-90). In an order dated July 15, 2009, Administrative Law Judge ("ALJ") David G. Hatfield dismissed Shoup's second request on the ground that it had not been filed within the sixty-day limitations period established by 20 C.F.R. § 416.1433(b). (R. at 58-61). The ALJ vacated the dismissal order on July 23, 2009, after learning that Shoup's initial request for a hearing had been timely filed. (R. at 62). On May 24, 2010, a hearing was held in Seven Fields, Pennsylvania. (R. at 9-54).

Shoup, who was represented by counsel, appeared and testified at the hearing. (R. at 13-45). Patricia Murphy ("Murphy"), an impartial vocational expert, also testified at the hearing. (R. at 45-52). In a decision rendered on July 1, 2010, the ALJ determined that Shoup was not "disabled" within the meaning of the Social Security Act. (R. at 63-76).

On August 31, 2010, Shoup sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council. (R. at 7-8). The Appeals Council denied the request for review on May 21, 2012, thereby making the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). (R. at 1). Shoup commenced this action on July 20, 2012, seeking judicial review of the Commissioner's decision. (Docs. 1 & 2). The parties have filed cross-motions for summary judgment, which are now ripe for disposition.

Shoup was born on May 2, 1964. (R. at 13, 75, 134). He sustained several concussions while playing football for Seneca Valley High School. (R. at 217). Although Shoup dropped out of school before completing the twelfth grade, he later obtained his General Educational Development ("GED") certification. (R. at 445). He periodically worked as a carpenter after quitting school. (R. at 18-19).

The record indicates that Shoup has a long history of alcohol abuse. (R. at 710). He has been incarcerated for driving under the influence of alcohol. (R. at 17, 191-193). Shoup testified that he had been charged with violations of Pennsylvania's Motor Vehicle Code five or six times. (R. at 15-16). His first offense apparently was committed in 1993. (R. at 610). After committing an alcohol-related driving offense in May 2000, Shoup spent twenty-three and a half months serving a prison sentence at the State Correctional Institution at Waymart. (R. at 17, 710).

Shoup was admitted to Butler Memorial Hospital on January 13, 2003. (R. at 194-198). At the time of his admission, Shoup reported that he had experienced a six-day "relapse into alcohol dependence" after nineteen months of sobriety. (R. at 194). He was "consuming a case of beer" and "a fifth of vodka" on a daily basis. (R. at 196). His hospitalization ended on January 21, 2003. (R. at 194).

On April 25, 2004, Shoup returned to Butler Memorial Hospital and reported that he was drinking one case of beer per day. (R. at 200). He was discharged four days later. (R. at 199). During an outpatient evaluation performed on July 20, 2004, Shoup told Dr. Julie Garbutt that he needed to be on Klonopin to feel better. (R. at 636). Expressing suspicions about Shoup's desire for that medication, Dr. Garbutt decreased his dosage and informed him that she would not renew his prescription on a regular basis. (R. at 637).

Shoup went to Butler Memorial Hospital's emergency room on August 6, 2004, complaining of suicidal thoughts. (R. at 202). The attending medical personnel observed that he was intoxicated. (R. at 202). It was noted that Shoup was "a daily user of Klonopin," and that he had benzodiazepines in quantities larger than those authorized by his prescribing physicians. (R. at 204). He remained hospitalized until August 11, 2004. (R. at 202). Shoup continued to take Klonopin after leaving the hospital. On March 28, 2006, Dr. Ron Lobo recommended that Shoup's use of Klonopin be minimized. (R. at 218).

Dr. Timothy Lesaca started to treat Shoup in August 2006. (R. at 229). In a letter dated January 29, 2007, Dr. Lesaca declared Shoup to be "psychiatrically disabled" because of his "inability to tolerate stress." (R. at 230). Dr. Lesaca further stated that Shoup had not required hospitalization. (R. at 229). It is not clear whether Dr. Lesaca was unaware of Shoup's earlier

hospitalizations, or whether his statement referred only to the period of time beginning in August 2006.

Shoup sometimes experiences pain in his back and shoulders. (R. at 428). On June 7, 2007, he underwent surgery to repair a torn rotator cuff in his right shoulder. (R. at 518-519). At the hearing, Shoup attributed his physical impairments to injuries sustained while playing football and lifting his daughter. (R. at 21). He also acknowledged that he had been involved in several car accidents. (R. at 21).

At some point, Shoup resumed his consumption of alcoholic beverages. He also continued to take Klonopin. Shoup was hospitalized from January 16, 2008, through January 18, 2008. (R. at 442). Upon admission, he was experiencing suicidal ideation. (R. at 444). Shoup reported that his alcohol consumption had escalated during the previous few months. (R. at 445). He told the attending medical personnel that Klonopin was the only medication that had ever helped him, and that he intended to continue taking it after his discharge. (R. at 444-46).

Shoup's drinking problem continued after his release from inpatient psychiatric treatment. On June 2, 2008, he was hospitalized for abdominal pain. (R. at 432). Shoup reported that he had been drinking more than thirty beers per day. (R. at 430, 431). It was determined that he was suffering from alcoholic pancreatitis. (R. at 430-435). He was discharged the next day. (R. at 430).

During his June 2008 hospitalization, Shoup stated that he needed to take Klonopin in order to avoid "terrible panic attacks." (R. at 441). He expressed confidence that his treating psychiatrist, Dr. Renata Jurczak, would refill his prescription. (R. at 441). Shoup told the attending medical personnel not to send Dr. Jurczak copies of documents describing his

4

hospitalization. (R. at 441). After conveying that instruction, Shoup was encouraged to "discontinue all benzodiazepines on a regular basis." (R. at 441).

On October 9, 2008, Dr. Jurczak detailed Shoup's alleged mental limitations on a medical assessment form. (R. at 233-235). She reported that he could not demonstrate reliability, relate predictably in social situations, or deal with work-related stress. (R. at 233-235). Shoup's abilities to relate to co-workers, deal with members of the general public, interact with supervisors, maintain attention and concentration, and behave in an emotionally stable manner were described as poor. (R. at 233-235). Dr. Jurczak opined that Shoup could fairly be expected to follow work rules, use proper judgment, function independently, maintain his personal appearance, and understand, remember and carry out complex, detailed or simple job instructions. (R. at 233-235). Shoup contacted Dr. Jurczak's office on March 5, 2009, and asked if he could take Ativan along with his Klonopin. (R. at 689). Dr. Jurczak expressed concern that Shoup was seeing her only to obtain refills for his prescriptions. (R. at 689).

On March 10, 2009, Dr. Robert L. Eisler performed a consultative psychiatric evaluation of Shoup in connection with his application for SSI benefits. (R. at 476-480). After completing the evaluation, Dr. Eisler indicated that Shoup had "extreme" limitations in his abilities to carry out instructions, respond appropriately to work pressures in a usual work setting, and interact appropriately with supervisors and members of the general public. (R. at 479). Dr. Eisler identified "marked" limitations in Shoup's abilities to make simple work-related decisions and respond appropriately to changes in a routine work setting. (R. at 479). Shoup was deemed to be "moderately" limited in his abilities to interact appropriately with co-workers and understand and remember detailed instructions. (R. at 479). In the narrative portion of his examination

report, Dr. Eisler opined that Shoup's major depressive disorder and generalized anxiety disorder had left him with "little ability to work," and that his prognosis was poor. (R. at 477).

Dr. Arlene Rattan, a non-examining psychological consultant, opined on March 12, 2009, that Shoup was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." (R. at 483). She stated that the evidence uncovered during Dr. Eisler's examination constituted only a "snapshot" of Shoup's functioning and "an overestimate of the severity of his limitations." (R. at 483). Dr. Rattan indicated that Shoup had no "marked" limitations. (R. at 481-482).

On August 3, 2009, Shoup asked Dr. Jurczak to add another benzodiazepine to his Klonopin. (R. at 699). He expressed indifference as to whether he was addicted to benzodiazepines. (R. at 699). In a statement submitted to Pennsylvania's Department of Public Welfare ("DPW") on May 7, 2009, Dr. Jurczak declared Shoup to be "temporarily incapacitated" through May 7, 2010. (R. at 566-569). She reported that he was compliant with his medication regimen, but that he was still suffering from bipolar and panic disorders. (R. at 569). Shoup's prognosis was described as "guarded." (R. at 569).

In February 2010, Shoup began to experience weakness and numbness in his left hand. (R. at 578-83). An electromyography ("EMG") performed on February 10, 2010, revealed that he was suffering from ulnar nerve palsy in his left arm. (R. at 575). On March 9, 2010, Dr. Parviz Baghai performed surgery on Shoup's left elbow to alleviate his symptoms. (R. at 575). (R. at 575, 780). During a follow-up appointment with Dr. Baghai on April 5, 2010, Shoup complained of pain in his neck and lower back. (R. at 804). He was advised to undergo physical therapy to improve his symptoms. (R. at 804).

At the time of his hearing before the ALJ, Shoup was awaiting the disposition of pending criminal charges stemming from his operation of a motor vehicle with a suspended driver's license. (R. at 15-17, 41-42). Shoup testified that he had crashed his truck in October 2009 while trying to pick up a lighter from under the steering wheel. (R. at 41). He explained that he had "crashed" all of his family's vehicles, forcing his wife and children to rely on friends for transportation. (R. at 18).

Shoup was found to be suffering from a substance abuse disorder, depression, an anxiety disorder with panic attacks, obesity, and degenerative disc disease of the cervical spine. (R. at 68). These impairments were deemed to be "severe" under the Commissioner's regulations. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c). At the third step of the sequential evaluation process, the ALJ determined that Shoup's impairments (including those attributable to continued substance abuse) equaled Listings 12.04 and 12.09. (R. at 69-70).

Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended the Social Security Act to provide that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." Pub. L. No. 104-121, § 105; 110 Stat. 847, 852-53 (1996); 42 U.S.C. § 1382c(a)(3)(J). The Commissioner has promulgated regulations to implement this statutory mandate. Under the applicable regulations, the critical question is whether a claimant who is disabled as a result of drug or alcohol abuse would remain disabled if he or she were to stop using those substances. 20 C.F.R. § 416.935(b)(1). If his or her disability would persist even after a cessation of drug or alcohol abuse, he or she is entitled to benefits. 20 C.F.R. § 416.935(b)(2)(ii). If a claimant's disability would cease in the absence of continued drug or alcohol consumption, a finding of "materiality" is warranted, thereby requiring

7

a denial of benefits. 20 C.F.R. § 416.935(b)(2)(i). When the independent effects of a claimant's impairments cannot be separated from the effects of his or her continued substance abuse, an award of benefits is proper. *Salazar v. Barnhart*, 468 F.3d 615, 622-26 (10th Cir. 2006).

Given the mandate of § 105, the ALJ was required to consider whether Shoup's *per se* disability under Listings 12.04 and 12.09 was attributable to ongoing substance abuse. In accordance with 20 C.F.R. § 416.945, the ALJ hypothetically assessed Shoup's residual functional capacity as follows:

> If the claimant stopped the substance use, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to simple tasks with little to no judgment; he should have no interaction with the public and only occasional interaction with coworkers; and limited to work with no production rate pace, but rather goal-oriented in nature.

(R. at 71-72).

Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Shoup would be capable of working as a cleaner, marker or coin machine collector in the absence of continued substance abuse. (R. at 76). Murphy's testimony established that these jobs existed in significant numbers in the national economy. (R. at 47).

The ALJ discredited the opinions expressed by Dr. Lesaca, Dr. Jurczak and Dr. Eisler on the ostensible ground that Shoup had not been candid with them about the extent of his addictions. (R. at 74-75). The "most weight" was accorded to Dr. Rattan's assessment, which the ALJ found to be "consistent with the claimant's mental status examination findings during periods of sobriety, his response to treatment during periods of sobriety, and his overall function." (R. at 74). The ALJ clearly based his materiality determination on Shoup's addictions to both alcoholic beverages and prescription medications. (R. at 73).

8

The materiality determination in this case is problematic in that the same medications relied upon to deny Shoup's application for benefits may have necessary to prevent him from experiencing disabling functional limitations. Under certain circumstances, a claimant's addiction to prescription medications can justify a denial of benefits under § 105 of the CWAAA. *Johnson-Winborn v. Apfel*, 106 F. Supp.2d 1144, 1147 (D. Kan. 2000). It is also true, however, that a claimant is not "disabled" if proper medical treatment would restore his or her ability to work. *Hansford v. Astrue*, 805 F. Supp.2d 140, 150-51 (W.D. Pa. 2011); 20 C.F.R. § 416.930. During his August 2004 hospitalization, it was noted that Shoup had started to use benzodiazepines in excess of his prescribed dosage. (R. at 204). Nevertheless, the record also indicates that Dr. Jurzcak was aware of Shoup's addiction and taking steps to ensure that he was using only the medications necessary to control his symptoms. (R. at 689, 699). On May 7, 2009, Dr. Jurczak reported that Shoup was compliant with his medication regimen. (R. at 569). Shoup testified that while his need for Klonopin carried a "potential for abuse," his treating healthcare providers were only giving him as much as he needed for medical reasons. (R. at 29). He apparently needed to take Klonopin in order to curtail his panic attacks. (R. at 218). The ALJ's decision makes no reference to evidence which contradicts Dr. Jurczak's report or Shoup's testimony.

Shoup was repeatedly hospitalized after consuming excessive amounts of alcohol. (R. at 194-201, 430-35, 438-46). For this reason, the record contains overwhelming evidence supporting the ALJ's assertion that Shoup's condition tended to worsen when he was drinking. The converse, however, is not necessarily true. The mere fact that Shoup was not hospitalized during periods of sobriety does not mean that he was capable of working during those same periods of time. *Lukaszewicz v. Astrue*, Civil Action No. 10-1185, 2011 WL 2441732, at *11,

2011 U.S. Dist. LEXIS 72942, at *28-29 (W.D. Pa. May 27, 2011).  Indeed, Dr. Lobo suggested that Shoup's anxiety had actually *increased* during his periods of sobriety.  (R. at 216).

SSI benefits are not payable for any period of time predating a claimant's application.  *Cordova v. Chater*, 125 F.3d 166, 171 n.1 (3d Cir. 1997); 20 C.F.R. § 416.335.  Shoup protectively filed his application on October 29, 2008.  (R. at 134, 150).  Earlier medical records are relevant to the analysis only to the extent that they are probative of Shoup's condition on or after that date.  *Reilly v. Office of Personnel Management*, 571 F.3d 1372, 1380-83 (Fed. Cir. 2009).  The documentary record suggests that Shoup's last alcohol-induced hospitalization occurred in June 2008.  (R. at 430-35).  Dr. Jurczak and Dr. Eisler completed their assessments in October 2008 and March 2009.  (R. at 233-35, 476-80).  Although Shoup acknowledged that he had consumed two bottles of beer in October 2009, he testified that he had been alcohol-free during the preceding year.  (R. at 26-27).  Shoup further stated that he had not consumed alcoholic beverages subsequent to his October 2009 accident.  (R. at 27).  Nothing in the ALJ's decision refers to evidence which contradicts Shoup's testimony.  As far as the Court can tell, Dr. Jurczak and Dr. Eisler assessed Shoup while he was sober.

The ALJ gave the "most weight" to the opinion expressed by Dr. Rattan, who had never examined Shoup.  (R. at 74).  The Court of Appeals for the Third Circuit generally disfavors administrative decisions which credit the opinions of non-examining consultants over those of treating and examining physicians.  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008).  In limited circumstances, assessments provided by non-examining sources can outweigh those supplied by treating and examining sources.  *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361-63 (3d Cir. 2011); *Brown v. Astrue*, 649 F.3d 193, 196-97 (3d Cir. 2011).  Those circumstances, however, are not present in this case.

The ALJ rejected the opinions expressed by Dr. Lesaca, Dr. Jurczak and Dr. Eisler solely because of Shoup's alleged efforts to hide his addictions from them. (R. at 74-75). There is nothing in Dr. Rattan's report which suggests that she based her opinion on a distinction between Shoup's periods of sobriety and his periods of active substance abuse. (R. at 481-98). Consequently, her opinion provides no evidentiary support for the ALJ's finding of materiality.

The Court acknowledges that the evidence supporting a materiality determination need not come in the form of "expert psychiatric opinion evidence." *Ambrosini v. Astrue*, 727 F. Supp.2d 414, 430 (W.D. Pa. 2010). Nonetheless, the ALJ was required to identify some form of medical evidence to support his finding of materiality. *Sklenar v. Barnhart*, 195 F. Supp.2d 696, 704 (W.D. Pa. 2002). Instead of doing so, the ALJ apparently based his decision on a more generalized finding that Shoup was so lacking in credibility that none of his treating or examining sources could be trusted. (R. at 72-75). Since the ALJ rejected the opinions of Drs. Lesaca, Jurczak and Eisler solely on the basis of pure speculation about what Shoup had told them (or not told them), his decision is not supported by substantial evidence. *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).

For the foregoing reasons, the Commissioner's decision denying Shoup's application for benefits cannot stand. The remaining question is whether benefits should be awarded, or whether a remand for further proceedings is the appropriate remedy. The record contains overwhelming evidence of Shoup's substance abuse problem. Furthermore, the assessments submitted by Drs. Lesaca, Jurczak and Eisler provide no useful guidance as to whether Shoup's disabling limitations were attributable to ongoing substance abuse during the relevant period of time. (R. at 229-230, 233-235, 476-480). When a claimant actively abuses drugs or alcohol, any materiality determination impacting his or her entitlement to benefits must be made on a

hypothetical basis. *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003). For these reasons, the proper remedy in this case is a remand for further consideration of Shoup's claim.

Shoup must be afforded an opportunity to be heard during the upcoming administrative proceedings. *Thomas v. Commissioner of Social Security*, 625 F.3d 798, 800-801 (3d Cir. 2010). In the event that continued drug or alcohol abuse is deemed to be material to Shoup's disabling mental impairments, the Commissioner must still consider the extent to which Shoup's physical impairments limit his ability to work. At the hearing, Shoup described difficulties that he had experienced while trying to grasp objects with his left hand. (R. at 38). The record suggests that the limitations alleged by Shoup may have compromised his ability to perform the duties of at least some of the jobs identified in Murphy's testimony. (R. at 47-48). Since the hearing was held only two and a half months after Shoup's left-arm surgery, the ALJ surmised that the limitations alleged by Shoup would not last long enough to change the hypothetical residual functional capacity assessment. (R. at 73); 20 C.F.R. § 416.922. If a residual functional capacity assessment is necessary on remand, the Commissioner will need to consider whether Shoup's handling abilities have improved as the ALJ expected.

Consistent with the foregoing, the Court hereby enters the following:

## II. ORDER

Plaintiff's Motion for Summary Judgment (**Doc. 7**) is **GRANTED**, and Defendant's Motion for Summary Judgment (**Doc. 9**) is **DENIED**. IT IS FURTHER ORDERED THAT the decision of the Commissioner of Social Security is **VACATED**, and this case is **REMANDED FORTHWITH** for further administrative proceedings.

IT IS SO ORDERED.

August 16, 2013                              s\Cathy Bissoon
                                             Cathy Bissoon
                                             United States District Judge

cc (via ECF email notification):

All Counsel of Record